Excuse me. The next is called for a large of the public. My name is Barbara Sherer and I represent the respondent appellant Hal Holt. Mr. Holt asked for this court to reverse the decision of the trial court indicating that he is a sexually violent person in need of commitment and to remand this case for trial to Madison County on the issue of whether or not he is a sexually violent person in need of commitment. My brief raises three issues. Whether the state failed to prove beyond a reasonable doubt that Mr. Holt suffered from a mental disorder and was substantially likely to engage in future acts of sexual violence. Whether the trial court's order committing him to a residential care facility in Rushville, Illinois was proper. And probably most importantly what I'm going to focus on in my oral argument was whether or not Mr. Holt was afforded effective assistance of counsel with Mr. John Delaney. You have my brief on the issues and frankly I have to admit that with what was before the trial court, the evidence that was there was probably sufficient. But the problem is the backbones of this case. As any good litigator knows, what goes on is really the backbones of the case and the strategizing. And unfortunately what happened in this case, and I will tell you, this is a hard case for me to make. I kind of dreaded coming down here today. When I first was assigned this case by Chief Judge Hilla and read through it, I knew it was a sexually violent person commitment and I really figured it was going to be just a challenge to the sufficiency of the evidence. And as I read through it and I realized that a big part of it was what happened as far as Mr. Delaney's representation of Mr. Holt, I was taken aback. I've known Mr. Delaney for 30 years. Those of us who practice in Madison County know him to be one of the best criminal defense attorneys that that county has seen, at least during my tenure. And as I read through it, I thought this couldn't happen. This is just unbelievable to me. Good attorneys don't make mistakes like this, but the reality is good attorneys do make mistakes. And it wasn't just one mistake. It was a compounding of multiple errors throughout that caused Mr. Holt to not get a fair trial for evidence to come before the jury and for him to be committed. I want to say convicted because in reality, although this was not a criminal proceeding, it was a wolf in sheep's clothing. Pardon me. The effect is the same. He can't leave the Rushville treatment facility. Whether it's a prison cell or a cage or not being able to leave a treatment facility, he's essentially being sentenced again. And the evidence that was before the jury shouldn't have gotten there in the first place. And if Mr. Delaney had provided him effective assistance to counsel, I don't think that that evidence would have gotten there. And I was saying that it's a difficult case for me to make. When I first read through it, it was difficult for me because I like John Delaney. Everybody likes John Delaney. And besides liking him, he's a great attorney. It was even more difficult for me to come down here today because of Mr. Delaney's untimely and sudden death last month to be sitting here before you and saying he didn't do a good job. But the reality is, again, we all make mistakes. You give me any litigator who says they've never made a mistake in their career and I will give you a liar because it happened. And in this case, it happened. There's no remedy for Mr. Holt. He doesn't get to bring a malpractice proceeding. I mean, if this were, you know, a case for damages, that would be the remedy. But the remedy for Mr. Holt is that he gets a new trial and he should get a new trial. Let me go through some of the things that were a problem at trial and in the pretrial proceedings that caused Mr. Holt to be convicted and that are evidence of Mr. Delaney's lack of diligence and ineffective assistance of counsel. To begin with, Mr. Delaney waived a probable cause hearing. Now, why would you waive a probable cause hearing? It's similar to a prelim hearing. We waive preliminary hearings regularly in criminal cases. But not when the stakes are high like this and not when the DSM-IV had been modified to the DSM-V and the diagnosis they were using as the basis for Mr. Holt's psychiatric diagnosis that caused him to be more likely to re-offend had recently changed. Why would you waive a probable cause hearing? That was problematic. Even more problematic was the fact that when Mr. Delaney requested a FRI hearing and was denied it, he didn't request a court reporter. I mean, who goes to a hearing on a criminal case and doesn't request a court reporter, especially when the stakes are this high? And again, I say a criminal case. I understand that this is a civil commitment proceeding. But the reality is that Mr. Holt is suffering double jeopardy because everything that was used to find him to be an SVP, a sexually violent person, were the same things that were used to convict him in the state. All we have are inflammatory descriptions to the jury that essentially amounted to double jeopardy. It's a bootstrap argument the way they had him committed as an SVP. They used the same information that they used or that they would have used. I mean, he did a plea agreement when he was convicted 30 years earlier. But it was that same information that was before the jury. Details of really heinous crimes. I mean, frankly, I read through it and it made my skin crawl. I mean, it's awful. I mean, I'm a female. I listened to this stuff, as did the nine female jurors, and they were probably sitting there thinking, oh my gosh, who wants this guy on the street? I don't want him around me. I don't want him around my friends. I don't want him around my daughters. But that information should not have come before the jury in the first place. And it came repeatedly again and again and again. And Mr. Delaney didn't object. Why wouldn't you object? He didn't object because he was not doing a good job for his client. My client was, he was not afforded effective assistance from counsel. And pursuant to due process requirements, he had the right to have that. This case might not have been won by the state. He may not have been convicted if that information had not come before these jurors. He was denied a FRI hearing. We don't know why. We don't know what the reasoning is. He didn't request a court reporter. I mean, frankly, when I received the reply brief from the AG's office, and it indicated that there was a transcript, and I thought, wait a minute, what did I do? I mean, I've had cases before where I've had to file for remand for repagination, or you realize that one court reporter didn't submit their transcript, or something happened. I mean, again, mistakes happen. So I went back. I went searching. I went to the clerk's office. I called all the court reporters, all the stenographers in Madison County, who I know regularly do criminal, thinking, where is this? How did I miss this? How was this not there? And the result I found out was Mr. Delaney didn't request a stenographer. Why would you not preserve the record? You know what? I don't know why you didn't preserve the record, because he wasn't doing his job properly. Again, my client was denied effective assistance of counsel. We may know why he was denied a FRI hearing and what went on if there was a record there. There's no way to review this. When he was denied the FRI hearing, the state then filed a motion to eliminate. They filed three motions to eliminate. One of them was to prevent Mr. Delaney from mentioning during trial, before the jury, the denial of a FRI hearing. It was more than that, though. It had a chilling effect. He really didn't even question the underlying bases of Dr. Bluesmith's, Dr. Travis's, or, well, Dr. Litton's diagnosis. And I think that was problematic, and it was another instance where he was denied effective assistance of counsel, my client. Additionally, we have a situation where one of the motions eliminated really prevented Mr. Delaney from even challenging Dr. Bluesmith or her credibility, because he was prevented from mentioning an earlier malpractice action and a complaint, I believe, to the Healing Arts Board, where she was essentially found to have been indifferent to her patient. Mr. Delaney committed further, there were further indications that he did not effectively assist Mr. Holt in his defense. He made some comment before the jury at the end about, well, I'm sorry, I just give up. Now, the state portrays that as a joke. This isn't funny. It's really not funny. Why would you say that? It's an indication that you really don't believe in your client. He filed a two-sentence motion, which they called, I think they said it was a monument to brevity. I mean, there just did not seem to be the interest and the, you know, the verve and the vibe that we saw usually from a good criminal defense attorney in representing Mr. Holt. When he lost the case, he filed a post-trial motion, and it was a pretty good post-trial motion. He actually indicates in it, I made mistakes, you know, that there were mistakes by defense attorney, defense counsel. It was a good motion. We have no idea what the basis of the denial of the motion is. Judge Harrison did really a simple order that didn't even really address it, but just indicated that he would be committed. The state wisely filed a motion, I believe, to strike it. Why? Because he filed it at a time. He didn't file it by day 29 or 30. He filed it, I think it was four months and three or four days after the trial and the finding that he was an SVP. Why would you file a post-trial motion to strike a motion that you thought was a good motion so far out of time? Because you're not doing your job properly. If nothing else, file that two-sentence motion that was the monument to brevity, asking the court to reconsider, and then when you have time, file a motion to amend it in more detail. That wasn't done. The points in his post-trial motion, if they'd actually been addressed properly, and again, we don't know why Judge Harrison denied it. I mean, it probably was properly denied because it was so far out of time. I mean, it would be as if I filed an amendment, and then the court made its final decision. Mr. Holt should get a fair trial. This court should be reviewing whether the changes between DSM-3 and DSM-4, which happened over the time period when they were evaluating him, and then when they actually had the SVP hearing, if the changes were still making his diagnosis acceptable in the scientific community. That was never done. There's no reason to deny him a FRI hearing. He is essentially being sentenced again, and while that may be appealing to the general public because of what happened in the past, the fact that this trial, everything in this trial was informed by his prior crimes. They were 30 years ago, and that's what was used. It was so highly inflammatory to the jury. There's no way to know if he was actually found to be an SVP because they found that he has a diagnosis that makes him likely to re-offend, or if it was because of his past crimes. There was so much a part of it. I mean, it really was a brilliant strategy by the state. I mean, it was kind of like a runaway train. Mr. Delaney wasn't doing, he wasn't doing a good job. I just don't know any other way to say it. I don't want to be disrespectful, but he didn't do a good job. There was a series, what is it, the Lemony Snicket's book, a series of unfortunate events, but unfortunately in this case, Mr. Holt has now spent five years in the Rushville Treatment Facility. We had an expert, his own expert, and one of the experts for the state at one point even indicated that he could receive treatment within the Madison County community, that there was sex offender prevention treatment, re-offense treatment that he could have had, and the answer essentially was that, well, we don't know if he'll do okay because he's been in prison for 30 years. Well, of course you don't. He's been in prison for 30 years. I mean, we know that. That's what he was sentenced to. Isn't there a, wasn't there a testimony concerning his failure to sign up for classes during that time, that 30 years that he was, you know, sentenced to originally, that he had signed up eight years prior to get some sort of in-house treatment for his, you know, diagnosed ailment and failed to comply with all the requirements to start that class because in his mind it was easier for him, or better in his mind to keep his prison job and earn some money than to waste time in treatment? Justice Barberis, there was testimony to that effect. I believe there was also testimony to the effect that those classes, there were so many people there needing treatment that they were difficult to get into and they took time to get into also. He had eight years to comply with, I think he had electrodes that needed to be placed on various parts of his body. That was the only thing that prevented him from getting that opportunity? Yes, but there was also indication that it was difficult to get into treatment. And he did get into treatment and was compliant. We also have experts indicating that he would be a good candidate for outpatient treatment. But whether, if I may, with all due respect, whether he complied with treatment or not, I think that has more to do with whether he would be more appropriate for residential or treatment in the community as I guess an outpatient would be the best way to describe it. Not whether he should have been determined to be an SVP for commitment in the first place. I mean, I think the problem is before you even get to these questions, you need to look at the way, we need to look at the way this trial unfolded and just the series of unfortunate events caused by Mr. Delaney's, I don't know if I want to call it lack of diligence, ineffective assistance of counsel. Well, there was also a lot of testimony concerning his failure to accept that he was guilty of these crimes. I think the three heinous acts that he had been convicted of, sexual acts, each of them, I don't know, did he basically take the stance that it was consensual? Even the one where they went in and tied up the clerk at the gas station and brought her out to a... And removed her eyeglasses and took her to a remote area. And because they had a gun on her, she performed acts as they requested and in his mind that was consensual. And while I understand what you're saying, I think the problem is, and I see this and I will tell you, as I was doing this, I keep returning to, oh my gosh, this is awful. I don't want to be walking to my car at night and knowing that somebody like that is out there. You don't want it for your wives, daughters, friends. I get that, but the problem is, and it's hard as attorneys even not to go back to that. We go back all the time to the underlying crimes. He was convicted for those, he was sentenced pursuant to sentencing guidelines, and in Illinois, the way it's supposed to work is you do your time and then you're done. He's essentially being sentenced again. And I understand that under the commitment proceedings, it's supposed to be whether or not there's a substantial likelihood of reoffense based on a mental condition. And I get that, but it's a bootstrap. And I don't mean you personally, I apologize, I didn't mean to be disrespectful. We keep going back to the fact that he did this in the first place. If he's not accepting responsibility, is he going to do it again? But we never had a chance to question into the details of the diagnosis and how the particular facts fit into it, and there needs to be a fry hearing. I'm not saying that you're wrong. You may be right, but the problem is we don't know if your assessment and what the assessment of the court was in this case is right, because we didn't have a fry hearing. We didn't have objections. And the things you're saying, these gory details, which pop out. I mean, they're like graphic things you hear on the news. And to be honest with you, I think it's worse that we had these descriptions without seeing the pictures, because the mind runs wild when you hear these things. And think of a jury of nine women, what they must have been doing. It shouldn't have been there in the first place. The problem is that the way this case happened and the fact that all this information was before the jury, that Mr. Delaney didn't question it, that we didn't have a chance to look into how much of the diagnosis and Dr. Ballew-Smith's, Dr. Travis's opinions really were based on these prior crimes, how much that was part of the diagnosis. It wasn't questioned. My point is this, he needs a new trial handled by an attorney who is on the ball, who's effectively assisting him, who's making a record. That's what needs to be done. The end result may be exactly where you're going, but we don't know. And considering how high the stakes are here, Mr. Holt deserves a fair shot. He deserves a new trial. Let me ask you, I don't remember being in the breeze, but let me ask you this. Sure. There's no question Mr. Delaney's done an untimely death. Was there any indication in the record that he was suffering from any kind of ailment that would affect his performance as trial counsel in this case, or any other case for that matter? I want to make sure I understand your question. Was there any indication in the record from this case that something that might have been going on with him, I think you're saying personally or medically? Medically, what affected his performance for Mr. Holt or affected his performance in other cases? Mr. Holt is the leader. But in other cases it may or may not be relevant. I'm wondering if there's anything indicating that in existence, much less what cases might be relevant. Okay, so let me answer what I think your question is. In this case, I don't necessarily believe there's anything in the record. It's more the lack of what should be in the record, or record at all, that caused me concern when I first was assigned this case. I have the benefit of knowing and having worked with Mr. Delaney. I'm sorry, I still call him John, because he's been John Delaney to me for years. So I had that, and it was just kind of like, how could this happen? Because I know him. It's sort of like proving a negative. It's like, how do you prove to the IRS that you did or didn't mail in something? You don't know. It's an omission. The state, in their brief, criticized the fact that I didn't cite to where Mr. Delaney didn't object. Well, if he didn't object, what am I citing to? I mean, it was throughout their arguments, their opening, their examination, and their closing that they engaged in highly, introduced highly prejudicial information. Mr. Delaney didn't object. What am I supposed to cite every time they said something, the fact that he didn't do anything? But to answer your question, I don't know that there's anything there besides the lack of it. I think you're also asking me, is there anything from any other cases that have gone on during that time period or in, I guess, the two years and three, four months since then between the time of Mr. Holtz? Mr. Holtz's trial, I believe, was in March of 15, right? And Mr. Delaney passed away, I believe it was August 6 or 7 of 17. So what is that, two years, four months more or less, two years, three months? I think you're asking me if there's anything from any other cases that indicate that Mr. Delaney, because of a medical issue, wasn't effectively assisting clients. Was that your question, Justice Goldenberg? And I will tell you, I don't know. But, I mean, in conversation... In conversations with colleagues and clients, I'm debating looking into it. So I don't have an answer to you at that point. I mean, are you asking me, do I know anything from personal knowledge and just from being in the Madison County community? I don't know. I mean, if you're asking me that, I'll answer it. I'm not going to say anything without you asking me because I almost feel like we're treading the line of what... Anything further? Thank you. Good morning. This is Attorney General Katherine Dorsch on behalf of the people. I'm not going to spend too much time on the sufficiency argument. I really don't feel that the respondent has a viable challenge to the sufficiency of the evidence here, particularly, obviously, in the light of the standard of review, which requires this court to construe the evidence in the light most favorable to the people. He doesn't contest that he has prior sexually violent conviction. The state's experts testified that he suffered from a mental disorder, specifically other specified paraphilic disorder under the DSM-5. And both of the state's experts testified that the respondent was substantially probable to reoffend. So in light of those findings, he really doesn't have a challenge to the sufficiency of the evidence. So unless the court has any further questions about sufficiency, then I turn to the disposition question. This court's review of the dispositional order is for an abuse of discretion. As you know, it's a standard of review. It requires this court to find that the trial court acted arbitrarily and reasonably, or no reasonable person would take the court's view. There's no merit to the contention the respondent's briefed that the court didn't take into account the proper factors under Section 40. Evidence on each of these factors was presented both in the expert's report and in the argument at the dispositional hearing. And the court's order specifically stated and recited that it considered the report, the expert's argument, and the Section 40 factors. And although Respondent's Witness did recommend conditional release, it wasn't unreasonable for the court to conclude otherwise. Dr. Travis testified that Respondent continues to suffer. This is critical here. It's not that he committed crimes in the past and had criminal thinking in the past. Respondent's current thinking remains criminal. And he continues to suffer from a mental disorder. And particularly his antisocial personality disorder would make him a poor candidate for treatment in the community. Because Dr. Travis testified that community-based treatment tends to be with lower-risk offenders, and they just don't have the same level of risk or needs, in fact. Plus there's less treatment available in the community, probably about half or less, depending on what he said. Usually a sex offender in community-based treatment can get about an hour and a half of group treatment a week and one hour of individual treatment. He said sometimes you can get more group treatment, but maybe not, no more than five hours. And also in the treatment-at-detention facility, there are other programs as well. They're sort of ancillary, not specifically sex offender-specific treatment. In fact, those were the sort of pre-treatment readiness programs that Respondent was participating in here. They allowed him to be successful later in sort of group therapy. They teach him the techniques. And to be successful and to participate in the group sex offender treatment, to become more comfortable about disclosing their offenses and taking feedback from others. So that sort of treatment is available in the TBI. And Respondent also had many probation and parole failures in the past. You may recall, I don't know that we've gotten into all the history of his probation and parole failures, but Respondent started committing criminal offenses as a juvenile. Repeatedly, as soon as he was released, within six months he was caught committing some new offense. And Dr. Travis opined that in light of that criminal history, he really needed the structure of the TDF, at least for an initial disposition, initial commitment. Counsel? The opposing counsel argues, yes, but. This goes back to the assistance of counsel. What's your response to that? That was the hard part. His offenses do go back 30 to 35 years. But what's important is that his current thinking is that same criminal thinking that led him to commit those offenses. We never know, even with an offender, say, whose prior offense occurred five years ago. Nobody ever knows for certain whether anybody is going to commit another offense. And we don't have to take that chance, that risk, in light of the fact that two state experts testified that he's got a mental disorder that predisposes him to commit these kinds of sexually violent acts and that he's substantially probable to do so. Probably the best evidence that Respondent continues to have these criminal thinking patterns are his own statements. He told the pre-release evaluator, which is neither Dr. Smith nor Dr. Travis. It's somebody when they first have, they screen everybody who has a sexually violent offense, and he told one of the evaluators that he feels men should be able to have sex whenever they want. He's minimized his offenses when he talked to Dr. Travis, when he talked to Dr. Smith. He's minimizing his offenses. As the court mentioned, he did tie up one of his victims, but when he described that offense, he said, oh, they tied her up, and they kidnapped her, and they drove her out to the abandoned military base. And he started talking about that, and he said, oh, yeah, she was a sweet little girl, sexy as anything. With respect to that one, he told Dr. Smith that they were just swapping spit, and he let her perform oral sex on him. So he continues to have the distorted views of things. There was a 1978 offense. Those comments about the sexy little thing and so forth and so on that you just mentioned, those were made in the evaluation for this. Those weren't taken directly out of the trial for that offense. Right, they were made to these evaluators here, yes. And he told Dr. Travis with respect to that offense that, oh, she was scared, so I let her give me a hug. So Dr. Travis said that kind of thinking, those kind of responses, right out of the respondent's mouth during the time of these evaluations revealed that he still has this criminal thinking now. So it's not that he's being committed for past behavior or past thinking, that experts are assessing his current mental state and his own comments to that offense. With respect, again, getting back to that middle offense that he committed, all he had to tell Dr. Travis about it was that, well, that one landed him in Pontiac in the middle of the prison riot. And everybody was trying, said 1,500 people trying to kill anything white. So it's this kind of thinking that he's demonstrating through his own words that these experts conclude that he continues to have this criminogenic thinking, as Dr. Travis called it, that this current mental state remains such that he is substantially probable to commit offenses. So my understanding of counsel's argument is more along the lines of, okay, those things could have been used by the jury to convict him or to keep him in, but the other testimony that was more directly linked to the prior offenses should not have come in. And the fact that Attorney Delaney failed to object to them proves that he was ineffective as counsel for this guy. So address that. How do we get past the fact that perhaps Delaney was ineffective? Sure. Experts are allowed under Illinois law, under Wilson v. Clark, and then the SBP case is applying Wilson v. Clark to talk about facts that are relevant, that underlie their opinion, right? So that they try your facts and test the validity of the expert's opinion. And there are cases, I'm sure I cited some of my briefs off the top of my head. I know Butler was one out of the first district, I believe. The experts can testify about the facts of the crimes that they found relevant to their diagnosis, and certainly the facts where the doctors testified that the fact that he tied up his victims and used more force than necessary, Dr. Smith described it, that kind of, those facts are relevant to her diagnosis. They show why, they're the basis for the diagnosis. And there's no, CASA seems to suggest that there's some kind of a 403 balancing that has to be applied to the basis of opinion testimony. And there's no authority for that proposition. At most, you could say if it were wildly unreliable, if the experts relied on something that was five degrees of hearsay or a rumor, perhaps the court could exclude that. But the doctors testified here that these are the kind of records, and they listed all the records, the EOC records, the pretrial reports, pre-sentencing reports. They testified that these are the kind of records and information that experts in their field rely on in making these diagnoses. So really there's no, that kind of testimony can come in under Illinois law, it's simply not objectionable. So your argument then, counter-argument would be that Mr. Delaney's lack of objection to that line of questioning and that testimony was not ineffective, it was actually very effective in so much as he knew it was not, that it was permitted for those purposes and allowed it to happen. There is no basis to object, that's why it can't have been effective on that point. What's your position related to that on the question of the proctor, should there have been a prior hearing? I'm sorry? Should there have been a prior hearing as far as the types of diagnoses? No. Well, first of all, we don't have a record, so we have to assume that the circuit court judge was correct in his ruling. The absence of the record is construed against the respondent in this case. So we have to assume it's correct both as a matter of fact and law. The respondent tries to put that off on trial counsel for the lack of the record, but of course appellate counsel could have complied or availed themselves of Rule 323 procedures and prepared a bystander's report or an agreed statement of fact. I just wanted to get that out there because it is barred, but we don't need to rely on that bar, because it is generally accepted. There are cases out of the 1st and 2nd District saying that paraphilia NOS non-consent is generally accepted. In Rae, detention of New, the case that respondent's counsel cited in his Frye motion, is not to the contrary. New is a case where the diagnosis was paraphilia qualifier, a pubescent males qualifier that the respondent argued and the Supreme Court believed was the same as hebophilia, which the court said, well that's new and novel, and state either you can show us that it's generally accepted through court opinions or it's going back for hearing. They sent it back for hearing. The court distinguished the cases that I'm relying on, the 1st and 2nd District cases, Melcher, Hayes, Lieberman, that were paraphilia NOS cases. They said, that's fine, but those aren't the same diagnoses. They're different diagnoses because they don't have the hebophilia qualifier on them. Lack of record aside, they're the same diagnosis, they're generally accepted, no prime hearing is necessary. Briefly on the risk of ineffective assistance allegations, counsel hasn't argued prejudice. So it wasn't wrong to fail to object to the basis of opinion testimony because it's allowed under law. Beginning the argument, well I just give up, well no, sorry. Clearly sarcasm. When you read the record, counsel did not give up. He was arguing that you shouldn't give up. You shouldn't believe this. Look, the state's trying to put this guy away. This act didn't even exist when he went into prison and now they're trying to put him away, they're trying to punish him for bad things. He certainly argued he didn't abandon, he didn't wave his white flag. He never was giving up on his argument or his client. Post-trial motion, whether it was late, whether it wasn't late, there is actually some dispute right now, I believe it's a split in the districts of the appellate court, when a post-trial motion is due in a sexually violent person's case because you've got that judgment with the jury verdict, but that's interlocutory and then you've got the final judgment. I can't recall which districts go which way, but some say you don't have to file it after the verdict. Within 30 days of the verdict, you have to file it 30 days after the disposition. Either way, if it was late, it didn't matter. The state tried to have it dismissed or stricken because it was late and the trial court denied that motion and it separately denied the post-trial motion. There's simply no prejudice here. It's just no reasonable probability, again, that absent counsel's minor errors, that the result of the proceedings or the disposition would have been different. So if this court has no further questions. I don't think so. Thank you. It's the elephant in the room. The prejudice is the fact that my client is committed to the Rushville treatment facility. It's essentially a prison. It's just a different type of prison. It probably looks nicer than where he spent 30 years in incarceration. But the reality is, had he been given a fry hearing, these diagnoses that the state got into very graphic detail about during the trial would have been questioned. We would have questioned the basis for the various experts' opinions. And they were all based on their interpretation of my client's recall of crimes 30 years ago. Everything goes back to the crimes from 30 years ago. And essentially what the state is advocating is a lifetime sentence. And that's fine. It may be that offenders who commit crimes like Mr. Holt did 30 years ago should be sentenced to life in prison. And that's fine. Maybe it's not such an awful idea. But we don't do it this way. The legislature changes the sentencing guidelines. The trial judge would sentence Mr. Holt to that. We don't have him serve his time and then essentially be reconvicted, or in this case committed, which is a euphemism for conviction again, based on the same crimes. We don't know how much of the SVP commitment has to do with his past crimes or the case that he's going to do it again. And we don't know that because he didn't have a F.R.I. hearing. The only questioning that really went on of the experts at trial was by the state. Mr. Delaney did very little. I mean, I don't know if that was ineffective assistance or the chilling effect from the motion in Lemonade being granted and him being told, don't get to mention the F.R.I. hearing. We don't know. But I guess my question is this. If the state's so confident in their position and can really make the jump that because of his mental disease or defect or a psychiatric diagnosis, there's a substantial likelihood that he will be sexually violent in the future, then let's do the F.R.I. hearing. Let's do a probable cause hearing. And let's give Mr. Holt effective assistance of counsel and see if he really belongs in the Rushville treatment facility. What's your position on the, excuse me, the state's position that there's no substantive difference between the DSM-3 and the DSM-4? Well, first of all, we don't, you mean DSM-4 and 5? Yep. You had 4 and 5, right? Right. Okay. Well, first of all, whether there is or there isn't, we don't know how any differences actually affect the diagnosis in regard to Mr. Holt. Additionally, the terms that were added with DSM-5, I think there could be an argument that they're unconstitutionally vague. I mean, you can throw anybody into it. But whether the difference in terminology or the difference in, I guess, the diagnostic criteria, or they call them axes, with DSM, they're into axes. Whether they apply to Mr. Holt, we never really got to explore that because of the denial of the fraud hearing. And I think with the change between DSM-4 and 5 over this time period and the fact that Dr. Beluse-Smith, when she testified, she didn't even know if her criteria was based on DSM-4 or DSM-5. Dr. Litton hadn't had the opportunity to look at Dr. Travis's report. There were just so many errors that the cumulative effect, we don't know, which is why we need to go back and have a fraud hearing and a new trial. It appears from the record that the basis of these diagnoses, it's all based on the past crimes. It's a bootstrap argument. We keep convicting him again and again and again. Everything goes back to the past crimes and the highly prejudicial and inflammatory nature of those heinous crimes. We really don't know. But as far as whether Mr. Holt still fits under one of the DSMs and whether or not they're scientifically accepted opinions, we really don't know. Because when the court made its ruling to deny the fraud hearing, there was nothing indicating that it was because they took judicial notice of the fact that these were scientifically acceptable criteria. Did I answer your question? I'm sorry. I apologize. Anything further? Thank you.